# United States Court of Appeals for the Federal Circuit

---

**CROWN PACKAGING TECHNOLOGY, INC., CARNAUDMETALBOX ENGINEERING LTD.,**
*Plaintiffs-Appellants*

**v.**

**BELVAC PRODUCTION MACHINERY, INC.,**
*Defendant-Cross-Appellant*

---

2022-2299, 2022-2300

---

Appeals from the United States District Court for the Western District of Virginia in No. 6:18-cv-00070-NKM-RSB, Senior Judge Norman K. Moon.

---

Decided: December 10, 2024

---

DANIEL J. GOETTLE, Baker & Hostetler LLP, Philadelphia, PA, argued for plaintiffs-appellants. Also represented by STEPHANIE M. HATZIKYRIAKOU, JEFFREY LESOVITZ.

DAVID EVAN FINKELSON, McGuireWoods LLP, Richmond, VA, argued for defendant-cross-appellant. Also represented by BRIAN CHARLES RIOPELLE, BRIAN DAVID SCHMALZBACH.

---

Before DYK, HUGHES, and CUNNINGHAM, *Circuit Judges*.

DYK, *Circuit Judge*.

Crown Packaging Technology, Inc. and related English corporation CarnaudMetalbox Engineering Ltd. (collectively, "Crown") brought suit against Belvac Production Machinery, Inc. ("Belvac") for infringement of various claims of U.S. Patent Nos. 9,308,570 ("the '570 patent"), 9,968,982 ("the '982 patent"), and 10,751,784 ("the '784 patent") (collectively, "the asserted patents") relating to necking machines. Belvac raised the affirmative defense of invalidity under pre-AIA 35 U.S.C. § 102(b), asserting that a necking machine embodying the invention claimed in the asserted claims was on sale by Crown in this country before the critical date of the patents.

Both parties sought summary judgment on this issue. The United States District Court for the Western District of Virginia granted summary judgment to Crown that the three patents were not invalid under the on-sale bar and denied summary judgment to Belvac. After a jury trial, the district court entered a judgment in accordance with the jury verdict that the asserted claims of the patents were not invalid and not infringed. Crown appealed the judgment of noninfringement, and Belvac appealed the judgment of no invalidity. Because the undisputed record shows that the asserted claims of the three patents were the subject of an invalidating offer for sale in the United States, we reverse and remand for a final judgment of invalidity. We do not reach the issue of infringement.

BACKGROUND

I

During the manufacture of metal beverage cans, it is common to reduce the diameter of the top of the can body through a process called "necking." The asserted patents

concern horizontal, multi-stage necking machines for necking cans at high speed and recite device claims on necking machines and assemblies. The earliest priority date of the three patents is April 24, 2008. The key question in this appeal is whether Crown, before the April 24, 2007, critical date of the asserted patents, made a commercial offer for sale in this country within the meaning of pre-AIA 35 U.S.C. § 102(b).

Crown, the owner of the asserted patents, makes and sells the CMB3400 necking machine. Before the critical date of the asserted patents, Crown sent a letter dated November 14, 2006, to a third party, Complete Packaging Machinery ("Complete"), that provided a "quotation" regarding Crown's CMB3400 necking machine and that was addressed to Complete's Arvada, Colorado address.[1] In a record documenting the sending of the letter, Crown listed Complete as "CPM, USA." J.A. 4763.

The letter, titled "Quotation Number Q22764," included a description and price for a 13 stage "3400 Die Necker," and it specified delivery as Complete's "nominated point of delivery," or alternatively, if no written nomination was received at the time ready for shipment, "our [(Crown's)] premises." J.A. 4724, 4731. It recited payment terms of "50% with order, 50% after buy-off in [Crown's] plant but payment must be received before despatch." J.A. 4730. The letter represented that the necking machine would be "[p]acked, ready for despatch 30 weeks from receipt of order," J.A. 4725, and that Crown would make "[e]very effort . . . to carry out the contract" in the event an eventuality made performance under the contract uncertain, J.A. 4732. The letter further dictated that

---

[1]    The letter to Complete lists "CarnaudMetalbox Engineering plc" as the sender. J.A. 4725, 4734. This company is encompassed within our definition of Crown.

"[q]uotations are valid for sixty days only and are subject to [Crown's] written acceptance of your order." J.A. 4731.

There is no indication that Complete ordered a necking machine, but Belvac contends that the letter was a commercial offer for sale to an entity in this country sent before the critical date, describing a necking machine that was ready for patenting and embodied the claimed invention of the asserted patents.

Crown sent similar communications to other companies dated between May and August 2007, less than one year before the earliest filing date of the asserted patents. Upon receiving orders in response to these other communications, Crown recorded the orders on internal order entry documents and sent "acknowledgements" of receipt of the orders. These communications do not directly implicate the pre-AIA on-sale bar because they were sent to companies after the critical date of the asserted patents and some were sent to a foreign country.

II

Crown filed suit against Belvac in the Western District of Virginia, alleging infringement of the asserted patents. Among other defenses, Belvac raised the affirmative defense of invalidity under pre-AIA 35 U.S.C. § 102(b), arguing that the letter to Complete was an invalidating offer for sale of the CMB3400 necking machine prior to the critical date of the asserted patents.

The parties cross-moved for summary judgment on the issue of the on-sale bar. Crown did not dispute that the CMB3400 necking machine was ready for patenting and embodied the claims of the asserted patents, nor did it dispute that the letter to Complete was sent before the asserted patents' critical date. However, it argued that (1) the letter was not a commercial offer for sale because it could not have created a binding contract through

acceptance; and (2) the letter was not an offer for sale "in this country." The district court concluded that the letter to Complete was "an invitation to make an offer, not an offer in itself," J.A. 108, and consequently granted Crown's motion and denied Belvac's motion.

At trial, the jury determined that the asserted patent claims were not invalid for lack of written description, were not obvious, and were not infringed. After trial, Crown filed a motion for judgment as a matter of law ("JMOL") or a new trial on infringement of the '982 and '784 patents,[2] and Belvac separately sought JMOL or a new trial on invalidity for lack of written description and for obviousness of the asserted patents. The district court denied both parties' motions and entered judgment accordingly.

Crown appealed the district court's noninfringement judgment on the '982 and '784 patents, and Belvac cross-appealed the district court's judgment regarding the on-sale bar and written description with respect to all asserted patents. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## DISCUSSION

### I

We need only address the district court's summary judgment decision rejecting the on-sale bar. We hold that the invention claimed by the asserted patents was the subject of an invalidating offer for sale in this country prior to the patents' critical date under § 102(b) of the pre-AIA statute. Accordingly, we reverse the district court's grant of summary judgment on this issue and its denial of

---

[2] Crown did not seek JMOL or a new trial on the issue of infringement of the '570 patent, and it does not appeal that noninfringement judgment.

summary judgment to Belvac. In light of our reversal of the district court's judgment regarding the on-sale bar, we need not reach Crown's arguments concerning infringement or Belvac's arguments concerning written description.

We review the district court's grant of summary judgment de novo. *Syngenta Crop Prot., LLC v. Willowood, LLC*, 944 F.3d 1344, 1355 (Fed. Cir. 2019) (applying Fourth Circuit law); *Noonan v. Consol. Shoe Co.*, 84 F.4th 566, 572 (4th Cir. 2023). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 257 (1986).

Under the pre-AIA on-sale bar, "[a] person shall be entitled to a patent unless . . . the invention was . . . on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b) (pre-AIA). The statute requires that (1) the subject of the offer for sale must embody the claims of the asserted patent; (2) the offer for sale must have been "in this country"; and (3) the offer for sale must occur before the critical date of the asserted patent. *Meds. Co v. Hospira, Inc. (Medicines I)*, 827 F.3d 1363, 1372, 1374 (Fed. Cir. 2016) (en banc) (quoting 35 U.S.C. § 102(b) (pre-AIA)).

*Pfaff v. Wells Electronics, Inc.*, 525 U.S. 55 (1998), also makes clear that, for the on-sale bar to apply, two additional conditions must be met before the critical date: the invention is (4) "the subject of a commercial offer for sale" and (5) "ready for patenting." *Id.* at 67; *see also Quest Integrity USA, LLC v. Cokebusters USA Inc.*, 924 F.3d 1220, 1227 (Fed. Cir. 2019) (citing *Pfaff*, 525 U.S. at 67). Whether an invention was on sale within the meaning of § 102(b) is a question of law that we review de novo based on underlying facts. *Junker v. Med. Components, Inc.*,

CROWN PACKAGING TECHNOLOGY, INC. v.                    7
BELVAC PRODUCTION MACHINERY, INC.

25 F.4th 1027, 1032 (Fed. Cir. 2022) (citing *Medicines I*, 827 F.3d at 1371).

On appeal, the parties do not dispute that the necking machine described in the letter to Complete was ready for patenting. They also do not dispute that the necking machine described in the alleged offer for sale embodies the claimed invention or that the alleged offer for sale was made by Crown more than one year prior to the asserted patents' earliest priority date. The only issues for us to resolve are thus (1) whether the letter was a commercial offer for sale; and (2) if the letter was an offer for sale, whether the offer was made in this country.

## II

To determine the question of whether there is a commercial offer for sale, "[w]e apply Federal Circuit law and analyze the issue 'under the law of contracts as generally understood.'"[3]   *Meds. Co. v. Hospira, Inc.*

---

[3]   Under the heading "LAW," the letter to Complete states that "English law applies," indicating the intent to apply English law to the alleged offer. J.A. 4734. Our case law, however, holds that we analyze the issue of commercial offers for sale under § 102(b) according to federal law. *See Medicines II*, 881 F.3d at 1351; *see also Scaltech, Inc. v. Retec/Tetra, LLC*, 269 F.3d 1321, 1328 (Fed. Cir. 2001) (explaining the issue of whether an offer is a commercial offer for sale within the meaning of § 102(b) is governed by federal common law). In any case, neither party at trial or on appeal relied on English law. Any issue of the application of English law is thus forfeited. *See Fraunhofer-Gesellschaft zur Förderung der Angewandten Forschung E.V. v. Sirius XM Radio Inc.*, 940 F.3d 1372, 1378 (Fed. Cir. 2019) (analyzing the issue of choice of law under the law of the regional circuit and finding the issue

(*Medicines II*), 881 F.3d 1347, 1351 (Fed. Cir. 2018) (quoting *Medicines I*, 827 F.3d at 1373). We "focus on those activities that would be understood to be commercial sales and offers for sales 'in the commercial community.'" *Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*, 855 F.3d 1356, 1364 (Fed. Cir. 2017) (quoting *Medicines I*, 827 F.3d at 1373 (quoting *Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1047 (Fed. Cir. 2001))), *aff'd Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*, 586 U.S. 123 (2019). For the purposes of § 102(b), "[a]n attempt to sell is sufficient so long as it is 'sufficiently definite that another party could make a binding contract by simple acceptance.'" *Hamilton Beach Brands, Inc. v. Sunbeam Prods., Inc.*, 726 F.3d 1370, 1374 (Fed. Cir. 2013) (quoting *Atlanta Attachment Co. v. Leggett & Platt, Inc.*, 516 F.3d 1361, 1365 (Fed. Cir. 2008)).[4] To determine whether a proposed offer is sufficiently definite, we look to the language of the proposed offer in view of general contract principles. *Id.* at 1375.

### A

Here, the alleged offer for sale was described as a "quotation" and was both directed to a specific company, Complete, and signed by Crown's representative, Adrian

---

forfeited); *Wiener v. AXA Equitable Life Ins. Co.*, 58 F.4th 774, 780–81 (4th Cir. 2023) (explaining that under Fourth Circuit law, "choice of law is waivable," and "[a] party abandons any claim that a different [forum's] law should govern the action if it fails to raise that issue before or during trial").

[4] *See also Group One*, 254 F.3d at 1048 ("Only an offer which rises to the level of a commercial offer for sale, one which the other party could make into a binding contract by simple acceptance (assuming consideration), constitutes an offer for sale under § 102(b).").

Long.  Both the district court and Crown place weight on the letter's use of "quotation," concluding that this term supports a determination that the letter is not a commercial offer for sale.  While we have previously explained that the labelling of a proposed offer as a "quote" or a "quotation" is an "important fact," we have also held that the "precise label used for a given communication . . . is not controlling."  *Junker*, 25 F.4th at 1035; *see also Atlanta Attachment Co.*, 516 F.3d at 1366 (concluding a quotation constituted an offer for sale); *Buildex Inc. v. Kason Indus., Inc.*, 849 F.2d 1461, 1463–64 (Fed. Cir. 1988) (holding that a "Quotation" that included essential price and quantity terms was a commercial offer for sale).  Instead, we examine the specific terms in the alleged offer for sale.  *Junker*, 25 F.4th at 1035; 1 Corbin on Contracts § 2.5 ("A quotation of price, standing alone, is not an offer[, but i]f it does not stand alone, it may be an offer." (footnote omitted)).

We first note this is not a case where the quotation was broadly disseminated, but instead the letter was sent specifically to potential-purchaser Complete and signed by Crown's representative, Adrian Long.  *See Junker*, 25 F.4th at 1033 (letter that was addressed to one customer was not an unsolicited price quotation or invitation to negotiate); *Merck & Cie v. Watson Lab'ys, Inc.*, 822 F.3d 1347, 1351 (Fed. Cir. 2016) (explaining that unsolicited quotes sent to numerous customers may not be offers).  The letter also characterized itself as an "offer," providing that the "offer [was] generally in accordance with [Crown's] conditions of sale and additional terms."  J.A. 4725.

Moreover, the letter to Complete was sufficiently definite as to the terms of the offer for sale to constitute a commercial offer for sale.  The letter provided a detailed description of the 3400 Necker and listed an actual price for that necking machine described as the "Total Price FCA

(Shipley/Our Packers)." J.A. 4724.[5] Under the terms of the letter, Complete was obligated to pay 50% of the purchase price with its order. The letter detailed delivery terms, including that the necking machine would be "[p]acked, ready for despatch 30 weeks from receipt of order," J.A. 4725, and that delivery would be at Complete's "nominated point of delivery" or, if not designated, at Crown's premises. J.A. 4731. Crown represented that it would make "[e]very effort . . . to carry out the contract but its due performance is subject to cancellation" as a result of causes "beyond [Crown's] control." J.A. 4732. The letter also explained that the "offer is generally in accordance with [Crown's] conditions of sale and the additional terms that follow," J.A. 4725, and then provided those conditions, including for payment, price variation, ownership, warranty, and liability. *See* J.A. 4731–34. And the letter stated that those standard conditions of sale "shall override any conflicting terms in [Complete]'s order." J.A. 4731. The "quotation" here had the hallmarks of an offer for sale. *See* 1 Corbin on Contracts § 2.5 (explaining where a quotation "contains language of commitment and detailed terms, it is an offer").

In *Junker*, we concluded that a letter that used the term "quote" but with similarly specific terms to the case here was a § 102(b) offer for sale. 25 F.4th at 1035. We explained that the proposed offer for a sale in *Junker*—a letter—"contain[ed] a number of necessary terms typical for a commercial contract." *Id.* at 1033. The letter specified the products for sale and prices and purchase options for those products. *See id.* As here, it provided delivery terms

---

[5]    The letter requested that "[t]o enable [Crown] to proceed with manufacture immediately upon receipt of an order," Complete supply mechanical and electrical information, can data sheets, and a completed questionnaire. J.A. 4725.

and conditions, specifying that "shipment will be 'FOB Athens, Texas,'" which we explained was used to allocate delivery and product loss risks and responsibilities. *Id.* Furthermore, the letter supplied payment terms, stating "net 30-day basis." *Id.*

We determined these terms were "sufficient to invoke § 102(b)'s on-sale bar." *Id.* at 1034; *see also id.* (summarizing sufficient terms in offer for sale cases); *Buildex*, 849 F.2d at 1463–64. The terms in the letter to Complete were similarly specific and complete, and consequently constituted a commercial offer for sale.

B

The district court also concluded that Crown's express reservation that "[q]uotations . . . are subject to [Crown's] written acceptance of your order," J.A. 4731, precluded Complete from creating a binding contract through acceptance. Our case law, however, counsels against concluding that a term of written acceptance is determinative. In *Helsinn*, orders under a supply and purchase agreement were "subject to written acceptance and confirmation by [patentee] before becoming binding." 855 F.3d at 1362. Despite this reservation, we held the agreement was a commercial offer for sale for the purposes of § 102(b), as the agreement "obligated [the patentee] to meet or designate a third party manufacturer to meet . . . firm orders." *Id.* at 1365. Likewise, in *Medicines II*, we concluded that a distribution agreement was an offer for sale even though, under the terms of the agreement, orders could be rejected within two business days of the order. 881 F.3d at 1349–51. We explained that "the terms of the Distribution Agreement show it was an offer for sale" because, notwithstanding the ability to reject orders, the agreement required the patentee to use commercially reasonable efforts to fill orders. *Id.* at 1351–52. *Helsinn* and *Medicines II* instruct that a communication when

taken as a whole may still be a commercial offer for sale even with an express written acceptance term.

The written acceptance provision in the letter to Complete similarly does not prevent the letter from being a commercial offer for sale. Notably, the letter obligated Complete to commence performance by paying 50% of the purchase price immediately with receipt of the order. The letter further provided that, "[t]o enable us to proceed with manufacture immediately upon receipt of an order," certain information was required from Complete, J.A. 4725, and Crown indicated that the necking machine would be ready 30 weeks from receipt of the order, suggesting Crown would immediately begin performance by filling requests upon order. *See* 1 Corbin on Contracts § 2.32 ("Under the provisions of the Restatement (Second) and U.C.C. § 2-206, commencement of performance that unambiguously indicates a commitment to the deal by the offeree creates a bilateral contract.").

Looking to Crown's own treatment of orders in response to similar letters confirms that the letter was sufficient to create a binding contract through acceptance. Significantly, Crown received orders from other third parties in response to communications similar to the alleged offer for sale. In response, Crown did not send back acceptance of the orders but instead sent back "Order Acknowledgments" to the third parties, demonstrating that orders were received, thereby implying the order was effective upon receipt. *See Acknowledgement,* BLACK'S LAW DICTIONARY (8th ed. 2004) (defining "acknowledgement" as "[t]he act of making it known that one has received something"). Crown also entered the orders on internal order entry documents. Most significantly, Crown's former senior vice president of business support, Mr. Forti, agreed that "if a customer received a quotation for a 3400 Necker and responded to that quotation with an order . . . consistent with the terms described in that

quotation," "a contract [would be] in place for [Crown] to then deliver a 3400 Necker to that customer." J.A. 4852 (242:14–21).

In an effort to defend the district court's judgment, Crown also argues that the letter to Complete omitted certain hallmarks of an offer for sale, including a description of the fully customized CMB3400 as well as final price, delivery location and method, and customer. We are unpersuaded. While Crown argues that the product was customizable, there is no dispute that Complete could have accepted an offer for the patented invention in the described form. And the fact that the customer was to provide additional information also did not prevent the letter from being an offer for sale. Similarly, the presence of separate terms in the letter and email concerning "Optional Extra Equipment," J.A. 4727, and "special paint," J.A. 4730, does not mean that the terms of the alleged offer are not otherwise sufficiently definite. These add-ons are for accessory items, not the basic necking machine itself. Contrary to Crown's argument, the letter to Complete has delivery terms and conditions, specifying the necking machine is "FCA (Shipley/Our Packers)," J.A. 4724, and that delivery will be at the place designated by Complete or otherwise Crown's premises.

Therefore, taken as a whole, the letter to Complete was a commercial offer for sale under the meaning of § 102(b).

C

Crown proffers an alternative argument for affirming summary judgment not reached by the district court. Crown argues that the letter to Complete did not trigger the on-sale bar because it was not made "in this country" as required under pre-AIA § 102(b). Appellants' Resp. and Repl. Br. 42. According to Crown's argument, an offer for sale made from outside the United States is made "in this country" only if the invention was sold for use in the United

States. We disagree. Our precedent demonstrates that an offer directed to a United States entity at its United States place of business is an offer "made in this country" as required for pre-AIA § 102(b). Similar to the facts here, in *In re Caveney*, an offer was "presumably made . . . from England," but directed to an offeree "at its place of business in the United States," and we held that § 102(b) was applicable. 761 F.2d 671, 676–77 (Fed. Cir 1985). In *Hamilton Beach Brands*, we reiterated our holding in *Caveney*, concluding that "a commercial offer for sale made by a foreign entity that is directed to a United States customer at its place of business in the United States may serve as an invalid[at]ing activity." 726 F.3d at 1375 (citing *Caveney*, 761 F.2d at 676–77); *see also C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1377 (Fed. Cir. 1998) ("[A] sale by a foreign distributor, from a foreign country to the United States can bar patent rights.") (citing *Caveney*, 761 F.2d at 676–77). That same principle applies here. Crown addressed its offer to Complete at its Arvada, Colorado, address. And Crown designated that offer in its system as to "CPM, USA." J.A. 4763. This is sufficient under our case law.

Crown argues that our non-precedential decision in *Caterpillar Inc. v. International Trade Commission*, 837 F. App'x 775 (Fed. Cir. 2020), which involved the question of whether a sale was in the United States, supports its arguments. Appellants' Resp. and Repl. Br. 42–46. But directly counter to Crown's argument, we stated in *Caterpillar* that, "[u]nder the pre-AIA on-sale bar, if the 'offer for sale' was 'made in this country,' then the invention would be 'on sale' in this country even if the

invention was sold for use outside of the United States." *Caterpillar*, 837 F. App'x at 778.[6]

We conclude that the undisputed record shows that Crown's offer for sale was made in this country, and here, the district court erred in granting summary judgment in favor of Crown and in denying summary judgment to Belvac.[7]

### CONCLUSION

We have considered the parties' remaining arguments on the on-sale bar and find them unpersuasive. For the foregoing reasons, the asserted claims of the asserted patents are invalid under § 102(b), and we reverse the district court's judgment and remand for entry of judgment in Belvac's favor.

### **REVERSED AND REMANDED.**

---

[6]    *W. L. Gore & Associates, Inc. v. Garlock, Inc.*, 721 F.2d 1540 (Fed. Cir. 1983), is also not helpful to Crown. There, a letter sent from New Zealand to Massachusetts contained an offer to sell a machine for producing PTFE thread seal tape. *Id.* at 1549. While we explained in passing that there is no evidence and no finding that the patented inventions became known or used in the United States, we did not address the question of whether an offer for sale must concern an invention sold for use in the United States. *See id.*

[7]    While denials of summary judgment are generally not appealable, "[a] denial of a motion for summary judgment may be appealed, even after a final judgment at trial, if the motion involved a purely legal question and the factual disputes resolved at trial do not affect the resolution of that legal question." *United Techs. Corp. v. Chromalloy Gas Turbine Corp.*, 189 F.3d 1338, 1344 (Fed. Cir. 1999) (citations omitted).

16          CROWN PACKAGING TECHNOLOGY, INC. v.
              BELVAC PRODUCTION MACHINERY, INC.

## COSTS

Costs to Defendant-Cross-Appellant.